Nott, J.,
dissenting:
Since the decisions in the cases of Miller,Montgomery, Palen, Bennett, aud Ruukle were rendered, the industry of our brother Scofield has brought to the attention of the court the Declaratory Act, 20th July,1808 (15 Stat. L., 125), and it is now thought by the majority of the court (Vanderslice’s Case, just decided) that that act has great significance in these cases, and that its declaration of what the law was is to be treated with the utmost respect.
I agree in the proposition and accept the test. If Congress have declared either in express terms or by necessary implication that the summary dismissal of an officer was irrevocable, let the judiciary accept that declaration of the law as the law, and apply it to antecedent as well as subsequent cases; for there were no vested rights to be disturbed by the statute, and Congress had absolute control of every office in the Army, and could abolish each at any time, or prescribe the conditions upon which it should be held. I agree also in the logic which finds a necessity for the principle having been declared one way or the other by Congress.
The subject of legislation being the power of the President to revoke his own orders dismissing officers from the Army, and the purpose of Congress being to declare the law, inquiry must be made as to what things Congress declared by prohib iting, and likewise as to what things Congress declared by *543 permitting. Considered as a declaration — not as an enactment of new law, but as a declaration of existing law — the silence of Congress may have been as- expressive as the words of a statute. If Congress declared the law to be and to have been that the President who inadvertently dismissed an officer in time of war had no power to correct his own error, then the conclusion which I reached in Miller’s case fall’s; and, conversely, if the legislative power either expressly or by necessary implication declared the law to be otherwise by recognizing the usage of the Executive in such cases and permitting its continuance, and treating it as a kind of common law, and acknowledging the existence of the power as one inherent in the office of President, then it cannot be maintained that such a power can exist only by virtue of statute law, and the conclusion reached by the majority of the court falls.
. When this act 1868 was passed there were two methods by which an officer could be thrust out of the Army in time of war; the first was by the summary dismissal by the President, the second by the sentence of a court-martial followed by the confirmation of the President. Under the first method the officer had no hearing, no trial, no opportunity to explain, the circumstances or justify his action. Under the second he had the assistance of counsel, the right to cross-examine his accusers, the means for procuring evidence, the power to summon witnesses, the deliberate verdict of his follow officers, the review of the Judge-Advocate General, the final-consideration of the President himself. To the American mind, the first method belongs to an absolute monarchy and a mediaeval age; the second method is in substance a judicial investigation, securing to the accused that great safeguard of personal rights, the judgment of his peers.
That Congress should have attached to such a judgment the element of finality is not surprising, and that they should have declared such to have been the law is what probably every lawyer would anticipate; but that Congress should have declared the one method to be as final and conclusive as the other seems to my mind a doctrine which could never have been uttered even in the warmth and inadvertence of debate.
I have turned therefore with no little curiosity to the debates that I might ascertain something of the views of that Congress which framed and enacted this declaratory law, and this is what I find. (Cong. Globe, 2d sess. 40th Cong., part 1, p. 133.)
*544 I find that the bill reported had received the unanimous approval of the Committee on Military Affairs; that it was reported and advocated and explained by James A. Garfield, then chairman of that committee; that it was not a declaratory bill when first considered by the House, and that it was referred back for the express purpose of making it such, and consequently that it received more than ordinary study and attention on that one point of what the law was which it should declare.
Passing to the debate, I find that General Paine, of Ohio, who had been a lawyer, a soldier, and a member of at least one of the important courts-martial of the civil war (Surgeon-General Hammond’s trial), asked the chairman of the Committee on Military Affairs this question:
“Where an officer is tried by court-martial under charges which could properly be punishable by dismissal from the Army and he is acquitted by the court, but the reviewing officer, disagreeing with the court and disapproving its findings, dismisses the officer from the Army, I would like to know whether the effect of this bill is to prevent the President from restoring that officer who has been dismissed from the Army under such circumstances ? ”
And the chairman of the Committee on Military Affairs answered :
“Not at all. By the act of July, 1862, the President of the United States was empowered summarily to' dismiss without trial. He granted that power to some subordinate commanders, and it was exercised to a very great extent during the war, so that hundreds of officers were dismissed by their commanding officers without trial. How that law has been repealed, and there is no power vested at this time [in time of peace] in any officer to dismiss a subordinate officer of the Army without the authority of a court-martial. In case a court-martial should find aman innocent, and the findings should be disapproved and the officer dismissed, that would be a summary dismissal, which is now [in time of peace] forbidden by law. But even though it were not forbidden by law, it would nevertheless be a summary dismissal and not such a dismissal as is contemplated in this bill, in accordance with the decision of a court-' martial.”
I find, further, that General Paine asked also this question:
“Would the effect of this bill be to prevent the President removing the disgrace following the sentence of the court-martian”
*545 And again the chairman of the Committee on Military Affairs—
“ Not in the least. The President may declare, as is declared in orders now every day, that the findings of a certain court-martial are revoked and the officer honorably dismissed, the dismissal to date from the decision of the. court, two or four years ago. That merely takes off the stain. But what we propose in this bill is, however much he may do in removing the stain from an officer, by way of revoking the finding, that he shall not restore him to service without the consent of the Senate — ■ he shall not home power to thrust a man back into the Army who by regular, due course of judicial proceeding has been put out. That is all.”
I find also that Mr. Mungen, of Ohio, asked the following question:
“ Charges were preferred against him [an officer] by a subordinate officer, desirous, as I- suppose, of getting his place. Those charges were sent to the War Department in the summer of 1862, and he was summarily dismissed by order of the Secretary of War on the 3d day of July. He was never tried by court-martial, and I believe there, is no record on file which had the approval of the President. I wish to know if this bill would stop an application now pending to remove that stigma and permit him to have an honorable discharge?”
And the chairman answered:
“My colleague will see that this bill does not touch such a case at all. It is confined exclusively to cases wipere the officer was tried by general court-martial and the finding regularly and formally appeared dismissing him or cashiering him. It would not touch the case of an officer who was dismissed by summary process, and therefore the case to which the gentleman refers would not be in the slightest degree affected by it.”
And I find nothing more in the House debates upon that subject. Moreover it was after these declarations by the chairman of the committee that the bill was referred back to be made declaratory of the existing law. In other words, it was referred back by unanimous consent to be made declaratory of the law as declared then and there by the Committee on Military Affairs.
In the Senate there was no discussion of the bill itself, but there was just enough of inquiry and response to show that the Committee on Military Affairs understood the existing law and the pending measure precisely as they had been understood in the House.
*546 Mr. Hendricks said:
u I should like to know from the committee reporting the bill whether there is an evil complained of in the Army in connection with this matter which justifies general legislation, .or whether this is intended to reach some particular case or cases. I had not heard of any evil of the sort that this bill would seem to meet and remove; but if it does exist, I should like to know from the chairman in what cases; what wrongs have been done that call for legislation in this direction; in what cases have officers been restored where it ought not to have been done. I know of some cases where they ought to be restored and they have not been restored.”
Mr. Wilson, chairman of the Committee on Military Affairs, replied:
“ It is not to meet any one case, but to meet any case that may arise. Several cases have arisen where persons have been court-martialed and dismissed the service and have been restored, some of whom certainly ought not to have been. I do not think the decision of a court-martial dismissing an officer from the service ought to be set aside on the partial representations that are made to the Executive. We know that the President cannot devote a great deal of time to the examination of cases of this character, and abuses have grown up under this power. Personal friends thus interested have interfered; and it is possible that in certain cases political friends have interfered to set aside the verdicts of court-martials. I think the military tribunals are entitled to their due iceight and consideration, and their judgment ought not to be set aside in this way unless on thorough examination.”
It is to be noted that when this debate occurred and this statute was enacted, the act 13 July, 1866, had recognized the power of the Oommander-in-Chief to dismiss an officer without a court-martial, and had left the xiower in him subject to the condition that it should be exercised only in time of war.
The sum and the substance of the whole matter is this: (1) The statute declares that the President has not power to restore an officer to his position in the Army if he was dismissed upon the conviction and sentence of a court-martial. (2) The statute leaves the usage of the President in reinstating officers summarily dismissed unimpaired. (3) The debates upon this declarative statute and the positive assurances of the military committees of both Houses acknowledge in the President an inherent discretionary power of revocation, with the right to annul the consequences of his summary orders of dismissal, *547 and with a unanimous expression of opinion that the exercise of that power is authorized by law, and intrinsically just and right.
Where the law-making .power refuses to take away the discretion of the President, and regards its exercise as in furtherance of justice, I am of the opinion that the judiciary should not interfere with it.